UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL THOMPSON o/b/o | ) | |
| RONDA THOMPSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:12CV01530 CDP |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.SC. § 405(g) for judicial review of the

Commissioner's final decision denying Ronda Thompson's application for

disability benefits under Title II of the Social Security Act (Act), 42 U.S.C. §§ 401

*et seq.* The claimant alleges disability due to chronic obstructive pulmonary

disease (COPD), emphysema, pain in her right shoulder, and a bleeding ulcer.

Because I find that the decision denying benefits was not supported by substantial

evidence, I will reverse the decision of the Commissioner and remand for further

proceedings.

---

[1] Carolyn Colvin became the Acting Commissioner of Social Security on February 14, 2013. As such, she should be substituted for Michael J. Astrue as the defendant in this suit. Fed. R. Civ. P. 25(d).

**Procedural History**

Claimant filed her application for benefits on March 13, 2009.  Claimant alleged disability beginning December 31, 2006.  Claimant's insured status under Title II of the Act expired on December 31, 2007.  On November 9, 2010, following a hearing, the ALJ issued an opinion that claimant was not disabled. The Appeals Council of the Social Security Administration denied her request for review on June 27, 2012.  Therefore, the ALJ's decision stands as the final determination of the Commissioner.  Claimant died from COPD on October 29, 2011, and her husband, Michael Thompson, was designated as the substitute party.

**Evidence before the ALJ**

<u>Application for Benefits</u>

Claimant completed an Adult Function Report in conjunction with her application for benefits on November 4, 2009.  In it, she stated that she took care of her cats, but needed help with the laundry because of her disability.  In a typical day, claimant got up, took care of her personal needs, took her medication, fed her cats, ate breakfast, and then watched television.  She reported that she needed to sit on the couch so she could breathe and that she had trouble walking.  She could take care of herself unless she had a bad day, and she did not need help taking medications.  She sometimes needed help dressing or fixing her hair.  She could prepare frozen meals on a good day, but on a bad day she made cereal or

sandwiches.  Claimant washed dishes and cleaned the kitchen and bathroom, but she needed frequent breaks.  Claimant did not go out alone in case she had a "breathing attack," but if the weather was nice she tried to go outside for 10-15 minutes per day.  She fell asleep on the couch for at least 45 minutes in the afternoon, then got up to feed her cats again and eat a snack.  She needed help doing laundry, but claimant grocery shopped once a week, paid bills, and handled money.  Claimant's hobbies included crocheting, reading, watching television, and puzzles, and she was able to do them "very well" despite her disability.  Claimant spent time with family every other week, but she did not go out often because she needed her portable oxygen machine.  Claimant avoided lifting, squatting, bending, standing, walking, talking, stair climbing, and completing tasks because it affected her breathing.  She could walk 20 minutes with oxygen before needing to rest for 10 minutes.  Claimant followed instructions and got along with authority figures "fine."  She did not handle stress well and was worried about money.  Claimant went to bed about 5:30 or 6:00 p.m.

Testimony

Claimant appeared in person for the September 13, 2010 hearing before the ALJ and was represented by counsel.  At the time of the hearing, claimant was 52 years old.  Her past relevant work was as an office worker, data entry clerk, accounting clerk, payroll clerk, collections clerk, transportation clerk, and laundry

employee.  Claimant alleged disability beginning December 31, 2006 because her emphysema and breathing "took a drastic turn for the worse" at that time.  She also reported pain in her right shoulder and a bleeding ulcer, but during the hearing she testified that her shoulder problem was resolved.  Claimant reported her condition made it hard to breathe, required her to be on oxygen as of June of 2009, and caused her to be exhausted all the time.

The claimant testified that her breathing problems became so severe that she could not walk across a room without having to sit down to catch her breath.  She reported chest pains associated with her breathing difficulties once or twice per month.  Additionally, she noted that she could not do household chores, she had to sit down to take a shower, she was sensitive to cleaning products and perfumes, and she could pick up her cat and a gallon of milk.  Claimant admitted that she smoked until 2009.

Brenda Young, a vocational expert, also testified at the hearing.  In response to questioning by the ALJ, the VE testified that a hypothetical individual limited to working at the sedentary exertional level with no more than moderate exposure to irritants or extreme temperatures could perform claimant's past relevant work as data entry clerk, transcription, and collections clerk.  The ALJ then modified the hypothetical to limit standing or walking to one hour total in an eight-hour day, but only for brief periods of time, with a need to sit again.  With that additional

limitation, the VE testified that the hypothetical individual could not perform any work. Upon cross-examination, claimant's counsel added the following additional limitations: the individual may be absent from work three or more times in a month due to symptoms and/or treatment; the individual would need two unscheduled breaks lasting an additional 15-20 minutes; and, the individual might be off task for up to 20 percent of a normal workday due to fatigue. In each of these hypotheticals, the VE testified that the individual could not work.

## Medical Records[2]

Dr. Aaron Bjorn, D.O., was claimant's primary care physician since 2006. A chest x-ray ordered by Dr. Bjorn and performed on December 12, 2006 revealed emphysema with diminished lung markings in the apices with slight crowding of the lung markings in the mid lung zones. Claimant's lungs were hyperinflated with an increase in the AP diameter of her chest. The impression was emphysema and aortic atherosclerosis. (Tr. 225).

---

[2] Here, claimant must prove she was disabled before her last insured date of December 31, 2007. "When an individual is no longer insured for Title II disability purposes, we will only consider her medical condition as of the date she was last insured." *Davidson v. Astrue*, 501 F.3d 987, 989 (8th Cir. 2007) (internal quotation marks and citation omitted). The record here includes medical evidence subsequent to claimant's last insured date. The Eighth Circuit Court of Appeals has recognized that it "has reached different conclusions about whether medical evidence concerning a claimant's condition at a later time is probative of her condition during the period of insured status." Id. at 990 (comparing *Rehder v. Apfel*, 205 F.3d 1056, 1061 (8th Cir. 2000) with *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984)). As this evidence is part of the administrative record, I summarize it here.

On January 26, 2007, claimant saw Dr. Bjorn for a cough, chest pain, shortness of breath, and chills. Claimant's next visit with Dr. Bjorn was on September 14, 2007, when she complained of shoulder pain and increased shortness of breath. Dr. Bjorn noted an impingement in claimant's right shoulder with a decreased range of motion and recommended physical therapy. During this visit he also diagnosed claimant with COPD and prescribed Spiriva and Proventil. He recommended a follow-up visit in one month. (Tr. 219).

Claimant was examined again by Dr. Bjorn on October 15, 2007. She reported the Spiriva was helping with her breathing and COPD. Dr. Bjorn continued her medications. (Tr. 218). On February 8, 2008, claimant reported continued shoulder pain, so Dr. Bjorn ordered a steroid injection and continued her COPD medications. (Tr. 217). On claimant's June 16, 2008 visit, Dr. Bjorn reported claimant's COPD to be stable. (Tr. 216). However, on October 27, 2008, Dr. Bjorn diagnosed claimant's COPD as worse. (Tr. 215). On December 15, 2008, claimant reported to Dr. Bjorn that she was short of breath with exertion and that Spiriva was no longer helping her COPD. Claimant stated that she was exhausted after 3:00 p.m. Dr. Bjorn diagnosed claimant with COPD and continued her Spiriva and Proventil (Albuterol) but also prescribed Advair. (Tr. 214).

On January 15, 2009, claimant presented to the emergency room at Jefferson Regional Medical Center complaining of shortness of breath. (Tr. 295). Alicia M, Haywood, M.D. examined claimant and noted that she appeared older than her stated age. Claimant felt better after using a nebulizer. Claimant was diagnosed with probable acute bronchitis with COPD. Upon discharge, she was advised to quit smoking and to use her nebulizer four times per day. (Tr.295-98). Chest x-rays taken during claimant's hospital stay showed advanced emphysematous changes, with bullous formation bilaterally but no active lung disease. (Tr. 332).

Claimant returned to the emergency room at Jefferson Regional Medical Center on March 16, 2009, for shortness of breath. Examination of her chest revealed minimal air movement and mostly wheezing. Claimant admitted that she smoked one to two packs of cigarettes a day. Claimant was treated with a one-hour continuous nebulizer and discharged that same day with a diagnosis of tracheal bronchitis and end stage COPD. She was given antibiotics and steroids and advised to use her nebulizers regularly and to stop smoking. (Tr. 289-92). Claimant returned to the emergency room three days later with severe dehydration secondary to nausea and vomiting. She was admitted and given intravenous fluids and discharged on March 22, 2009. (Tr. 287). However, she returned to the emergency room again on March 24, 2009, complaining of shortness of breath. Claimant denied chest pain or cough and stated that her shortness of breath

increased with exertion.  She was treated with a CPAP machine and released the same day.  She reported that she had quit smoking.  Claimant's diagnosis was COPD acute exacerbation and acute bronchitis.  (Tr. 278-81).

Dr. Bjorn saw claimant on March 27, 2009, after her hospitalizations and he diagnosed her with COPD exacerbation  and anxiety.  He prescribed Albuterol, Advair, Spiriva, and Xanax.  (Tr. 311).

On May 9, 2009, claimant was admitted to Jefferson Regional Medical Center for shortness of breath.   She admitted smoking four to five cigarettes per day.  Examination revealed diminished breath sounds in claimant's lungs bilaterally with no crackles or wheeze.  A chest x-ray showed fibrotic changes consistent with COPD.  Claimant was diagnosed with COPD exacerbation, severe COPD, and mixed severe restrictive and obstructive pulmonary disease.  She was advised to quit smoking and given the nicotine patch.  Claimant was discharged from the hospital on May 11, 2009 with a referral to a pulmonary clinic.  (Tr. 273-75).

On May, 19, 2009, claimant was seen by the referral pulmonologist Amanda E. Avellone, M.D., for further treatment of her COPD.  Claimant had quit smoking by this time.  Dr. Avellone performed several pulmonary tests, which demonstrated

elevated airways resistance and a significant bronchodilator response.[3]  Dr.

Avellone concluded that the tests demonstrated very severe obstructive pulmonary

disease with a component of reversible airways obstruction.  She diagnosed

claimant with very severe (Stage IV) COPD, asthma, and tobacco habituation.  She

continued claimant's prescriptions for Advair and Spiriva, with Albuterol as a

rescue inhaler, and urged claimant to remain abstinent from cigarettes.  (Tr. 341-

42).

Claimant was admitted to the hospital on June 15, 2009, for abdominal pain,

nausea, vomiting, and diarrhea.  A CT-scan taken the next day revealed diffuse

colitis.  After being diagnosed with colitis, claimant had a partial colectomy and

ileostomy on June 17, 2009.  She was discharged from the hospital on June 23,

2009.  (Tr. 259, 359-63).

Claimant saw Dr. Bjorn again on July 31, 2009, for shortness of breath and

anxiety.  Upon examination, claimant's lungs were clear with no crackles or

---

[3] Dr. Avellone tested claimant's FVC (Forced Vital Capacity) and her FEV1 (Forced Expiratory
Volume in 1 second).  FVC is the total volume of air expired after full inspiration, while FEV1
(Forced Expiratory Volume in 1 second) is the volume of air expired in the first second during
maximal expiratory effort.  Normal FEV1 levels are usually around 70 percent, and FEV1 levels
that are less than 40 percent of predicted indicate severe obstruction.  Patients with COPD have
decreased FVC.  The FEV1/FVC ratio is the percentage of the vital capacity which is expired in
the first second of maximal expiration.  Normal levels are around 70 percent.
<http://www.meded.uscd.edu/isp/1998/asthma/html/spirexp.html>.  Claimant's test results were
FEV1 34 percent of predicted, FVC 97 percent of predicted, with a FEV1/FVC ratio of 30
percent.

wheezes. He diagnosed her with COPD and anxiety and continued her medications. (Tr. 208-09).

Claimant began treatment with Kirk Nelson, D.O., a pulmonologist, for her shortness of breath on August 25, 2009. Claimant reported getting cyclical upper and lower respiratory tract infections every five or six weeks. She stated that she no longer smoked and got very short of breath when bathing, dressing, walking, or exerting herself at all. Upon examination, Dr. Nelson noted that she appeared chronically ill and older than her age. He found decreased air entry in her chest, but her lungs were otherwise clear. Dr. Nelson diagnosed claimant with COPD, severe emphysema, and recurrent signs of pulmonary infections. Dr. Nelson ordered additional testing and told claimant to take Advair and Symbicort 160/4.5 twice a day. (Tr. 386-87).

Claimant was admitted to the hospital on September 16, 2009, for severe shortness of breath. Claimant reported using two liters of home oxygen daily. She was diagnosed with COPD exacerbation, treated with bronchodilators and steroids, and discharged on September 19, 2009. (Tr. 250, 256).

During an examination on November 16, 2009, Dr. Nelson observed that claimant was chronically ill, with markedly diminished breath sounds and end-expiratory wheezes, none of which was minimal. Dr. Nelson diagnosed claimant with COPD and emphysema and continued her medications. (Tr. 382).

On January 10, 2010, Dr. Bjorn wrote a letter confirming that claimant had been his patient since 2006. In the letter he states that claimant "has been continuously disabled prior to 12/31/2007 for 12 consecutive months due to longstanding asthma and emphysema." (Tr. 327).

On February 13 2010, claimant returned to Jefferson Regional Medical Center emergency department with shortness of breath. She reported using home oxygen 24 hours a day for two days. Examination revealed faint wheezing and decreased breath sounds bilaterally, with mildly labored breathing at rest. A chest x-ray was taken and revealed a paucity of lung markings in the upper lung zones that were unchanged from her x-ray dated September 15, 2009, and consistent with severe COPD with some bullous emphysema. There was no indication of acute cardiopulmonary disease. Claimant was diagnosed with COPD acute exacerbation and bronchitis. She was treated with medications and a nebulizer and discharged the same day. (Tr. 503-09).

On May 3, 2010, Dr. Nelson completed a Pulmonary Impairment Questionnaire in connection with claimant's application for benefits. Dr. Nelson diagnosed claimant with COPD and chronic impairment of gas exchange due to clinically documented pulmonary disease. In support of this diagnosis, Dr. Nelson noted that claimant's FEV1 was 29 percent. He also noted claimant's other diagnostic tests (including her pulmonary functioning tests) supported his

diagnosis. Dr. Nelson identified positive clinical findings of shortness of breath, chest tightness, wheezing, rhonchi, edema, episodic acute bronchitis, fatigue, and coughing. He listed claimant's prognosis as poor. In terms of claimant's limitations, Dr. Nelson opined that, in an 8-hour day, the claimant could only sit for 2 hours a day, could stand and/or walk for less than 1 hour, and would need unscheduled breaks. He believed that she could never lift or carry more than 5 pounds and only occasionally lift 5 pounds and would need daily unscheduled breaks of 1-2 hours to rest during the workday. Claimant needed to avoid wetness, odors, fumes, temperature extremes, humidity, dust, perfumes, gases, solvents, cigarette smoke, soldering fluxes, and chemicals. Dr. Nelson stated that claimant's symptoms and/or fatigue would "constantly" interfere with her attention and concentration, and that her impairments produced good days and bad days. He believed that she would likely miss work more than 3 times per month due to her impairments, and he concluded his opinion by stating, "I doubt she can work at all." (Tr. 369-75).

On May 6, 2010, claimant saw Dr. Nelson for a follow-up visit. Claimant reported that she was doing well. Dr. Nelson diagnosed claimant with chronic respiratory failure and COPD with emphysematous and mildly asthmatic features. Dr. Nelson continued her medications and noted that she was given a prescription for portable oxygen to facilitate her quality of life issues. (Tr. 378).

Claimant was hospitalized on May 19, 2010, for a reversal of her ileostomy and developed acute vision loss. An MRI of claimant's brain taken on May 24, 2010, detected abnormalities highly suggestive of reversible posterior leukoencephalopathy. Claimant was discharged on May 26, 2010. (Tr. 403, 451-52).

On June 5, 2010, claimant was readmitted to the hospital for two days for nausea, vomiting, and abdominal pain. She was discharged on June 6, 2010, with a diagnosis of ileus. (Tr. 414-18).

On June 25, 2010, Dr. Bjorn prescribed portable home oxygen for claimant because her pulse oximetry test results were 89 percent. (Tr. 468). On July 16, 2010, claimant saw Dr. Bjorn for shortness of breath with exertion, but no coughing or wheezing. Dr. Bjorn's assessment was COPD, benign hypertension, depression, tobacco use disorder, and a peptic ulcer. He continued her medications and scheduled a follow-up visit. (Tr. 464-65).

On July 22, 2010, Dr. Bjorn noted that claimant's pulse oximetry test results were 94 percent before walking without oxygen, 88 percent walking without oxygen, 90 percent after walking without oxygen, and 100 percent after walking with oxygen. (Tr. 466).

During claimant's August 3, 2010 follow-up visit with Dr. Nelson, he noted that claimant was doing quite well following surgery. He noted that she remained

chronically ill but was in no acute distress. His diagnosis was chronic respiratory failure and severe COPD with emphysematous lung disease. He continued her medications and scheduled her for a follow-up visit. (Tr. 467).

In a letter dated September 28, 2010, Dr. Nelson summarized claimant's treatment. He stated that claimant suffered from COPD, a chronic impairment of gas exchange due to her pulmonary disease, shortness of breath, chest tightness, wheezing, rhonchi, cachexia, edema, fatigue, coughing, dyapnea, and episodic acute bronchitis. Dr. Nelson opined that claimant continued to suffer from the same symptoms and limitations outlined in the Pulmonary Impairment Questionnaire completed on May 3, 2010. He reiterated that claimant was incapable of working. In support of his opinion, Dr. Nelson noted that claimant had been diagnosed with emphysema after chest x-rays taken on December 11, 2006, demonstrated changes with diminished lung markings in the apices, hyper-inflation of the lungs with slight crowding of the lung markings in the mid lung zone, and degenerative changes of the thoracic spine. Dr. Nelson also stated that claimant saw Dr. Bjorn on January 26, 2007, with complaints of an ongoing cough, chest pain, and shortness of breath, which was eventually diagnosed as COPD by Dr. Bjorn on September 14, 2007. At that time, claimant was prescribed Spiriva and Proventil and continued on those medications, along with Advair, at home nebulizer treatments, and 24-hour oxygen. Dr. Nelson noted that he substituted

medications during his treatment of claimant in an attempt to produce less

symptomatology.  Dr. Nelson concluded his letter as follows:

> I do not believe [claimant] is capable of performing any significant work on a full-time sustained basis.  Upon extensive review of her previous medical records and my own continued assessment, it is medically reasonable that [claimant's] combined impairments rendered her disabled as early as December of 2006.

(Tr. 501-02).

## Medical Records Before the Appeals Council[4]

In a letter dated February 4, 2011, Dr. Bjorn reiterated that claimant was

"disabled from asthma, emphysema and COPD throughout the entire year ending

12/31/2007."  (Tr. 610).

Claimant was admitted to Jefferson Regional Medical Center on February 6,

2011, with chest pain, cough, and shortness of breath.  She was diagnosed with

COPD exacerbation and an upper respiratory tract infection.  A CT scan of her

chest taken the same day revealed COPD and basilar bullous changes on the left,

causing some parenchymal compression and resulting in the asymmetric

prominence of markings on the left.  Areas of bronchiectasis and mild pneumonitis

were detected, along with mild increased mediastinal adenopathy, nonspecific.

She was discharged with medications on February 8, 2011.  (Tr. 615-18).

---

[4] Additional evidence which was not before the ALJ was submitted to and considered by the Appeals Council.  The Court must consider these records in determining whether the ALJ's decision was supported by substantial evidence.  *Frankl v. Shalala*, 47 F.3d 935, 939 (8th Cir. 1995).

Claimant was admitted to the hospital again on February 25, 2011, for shortness of breath. Her diagnosis was acute chronic respiratory failure with COPD exacerbation. She was admitted to intensive care and treated. After being treated with steroids, antibiotics, and nebulizer treatments, she was discharged on February 28, 2011. (Tr. 647-58).

Claimant went to the emergency room on March 23, 2011, complaining of shortness of breath, fever, and chills. She was diagnosed with acute respiratory failure secondary to very severe COPD exacerbation, end stage. She was an ashen gray color, and had nausea, vomiting, and diarrhea. She was admitted to intensive care and treated with antibiotics and nebulizers before being discharged on March 31, 2011. (Tr. 679-80).

## Legal Standard

A court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). Substantial evidence is less than a preponderance, but enough that a reasonable person would find it adequate to support the ALJ's conclusion. *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as there is substantial evidence on the record to support the Commissioner's decision, a court may not reverse because substantial evidence exists in the record that would have supported a contrary outcome, *id.*, or because

the court would have decided the case differently. *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992). Evidence that supports as well as evidence that detracts from the ALJ's decision should be considered. *See Finch*, 547 F.3d at 925.

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole to consider:

1. the credibility of the findings made by the Administrative Law Judge;

2. the education, background, work, and age of the claimant;

3. the medical evidence from treating and consulting physicians;

4. the plaintiff's subjective complaints relating to exertional and nonexertional impairments;

5. any corroboration by third parties of the plaintiff's impairments; and

6. the testimony of vocational experts when required which is based upon a proper hypothetical question.

*Brand v. Secretary of Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. § 42 U.S.C. 416(i)(1); § 42 U.S.C. 1382c(a)(3)(A); § 20 C.F.R.

404.1505(a); 20 C.F.R. 416.905(a).  In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity.  If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities.  If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work.  If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy.  If not, the Commissioner declares the claimant disabled.  § 20 C.F.R. 404.1520; § 20 C.F.R. 416.920.

When evaluating evidence of subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence. *Basinger v. Heckler,* 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. *See, e.g., Battles v. Sullivan,* 902 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Heckler,* 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.

*Id.* at 1322. When an ALJ explicitly finds that the claimant's testimony is not credible and gives good reasons for the findings, the court will usually defer to the ALJ's finding. *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007). However, the ALJ retains the responsibility of developing a full and fair record in the non-adversarial administrative proceeding. *Hildebrand v. Barnhart*, 302 F.3d 836, 838 (8th Cir. 2002).

## The ALJ's Findings

The ALJ issued his decision that claimant was not disabled on November 9, 2010. He found that claimant had the severe impairment of COPD. However, the

ALJ found that claimant retained the residual functional capacity to perform sedentary work because she could lift or carry less than 10 pounds, and in an eight hour day, she could sit for eight hours and stand and/or walk for 30-45 minutes; however, she could not be exposed to wetness, humidity, dust, fumes, odors, temperature extremes, perfumes, gases, solvents or cleaning products, cigarette smoke, soldering fluxes, or chemicals. In fashioning claimant's RFC, the ALJ determined that her impairments could be expected to produce some of her alleged symptoms; however, he concluded that claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they are inconsistent with the RFC. Because the ALJ determined that claimant was able to perform her past relevant work as an office worker, data entry clerk, accounting clerk, payroll clerk, collections clerk, transcription clerk, and laundry worker, he concluded that she was not disabled.

## Discussion

Claimant contends that the ALJ improperly rejected the opinions of her treating physicians, Drs. Nelson and Bjorn. "The [Social Security] regulations provide that a treating physician's opinion regarding an applicant's impairment will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the] record.'" *Prosch v. Apfel,* 201 F.3d 1010, 1012–13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2)).

Consistent with the regulations, the Eighth Circuit has stated that a treating physician's opinion is "normally entitled to great weight," *Rankin v. Apfel,* 195 F.3d 427, 430 (8th Cir. 1999), but the Eighth Circuit has also cautioned that such an opinion "do[es] not automatically control, since the record must be evaluated as a whole." *Bentley v. Shalala,* 52 F.3d 784, 785–86 (8th Cir. 1995). Accordingly, the Eighth Circuit has upheld an ALJ's decision to discount or even disregard the opinion of a treating physician where other medical assessments "are supported by better or more thorough medical evidence," *Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir. 1997), or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions. *See Cruze v. Chater,* 85 F.3d 1320, 1324–25 (8th Cir. 1996).

Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must "always give good reasons" for the particular weight given to a treating physician's evaluation. 20 C.F.R § 404.1527(d)(2); *see also* SSR 96–2p. Here, the ALJ decided that claimant's COPD was not disabling because of her alleged "lack of ongoing treatment." According to the ALJ, the medical records did not "document treatment during the period of

2007-2008." He also concluded that the medical records did not document ongoing observations of significant breathing difficulties.

These findings are contrary to the substantial weight of the evidence and constitute reversible error. First, the ALJ erred when he stated that Dr. Bjorn began treating claimant in 2009 "when she was hospitalized for colectomy and colostomy surgery . . . ." (Tr. 17). Here, the medical evidence demonstrates that claimant first saw Dr. Bjorn for breathing difficulties in December of 2006, when her chest x-ray was ordered. That x-ray revealed emphysema with diminished lung markings in the apices with slight crowding of the lung markings in the mid lung zones. Claimant's lungs were also hyperinflated with an increase in the AP diameter of her chest. The impression was emphysema and aortic atherosclerosis. Dr. Bjorn subsequently treated claimant for coughing, chest, pain, and shortness of breath on January 26, 2007, and again on September 14, 2007 for shortness of breath with little ambulation. During the September 17, 2007, examination of claimant Dr. Bjorn diagnosed claimant with COPD and prescribed Spiriva and Proventil. Dr. Bjorn continued to treat claimant regularly. On January 25, 2010, Dr. Bjorn rendered an opinion confirming that claimant had been his patient since 2006 and that she was "continuously disabled prior to 12/31/2007 for 12 consecutive months due to long standing asthma and emphysema." Dr. Bjorn reiterated this opinion on February 4, 2011, stating that claimant had been

"disabled from asthma, emphysema and COPD throughout the entire year ending 12/31/2007." Dr. Bjorn was claimant's treating physician who diagnosed her with COPD well before her date last insured and treated her regularly for COPD throughout the remainder of her life. Yet the ALJ does not even address Dr. Bjorn's opinions or consider that Dr. Bjorn's diagnosis, treatment, and prognosis of claimant were rendered within, and/or pertained to, the relevant time period. Here, the ALJ gave no reasons – no less the required sound ones – for ignoring Dr. Bjorn's opinion. Therefore, I am unable to determine whether the ALJ even considered Dr. Bjorn's opinion at all, much less properly weighed it.

Dr. Bjorn's opinion is consistent with that of claimant's treating pulmonologist, Dr. Nelson. Although the ALJ did consider aspects of the opinion rendered by Dr. Nelson in the Pulmonary Impairment Questionnaire on May 3, 2010, he does not even discuss Dr. Nelson's September 28, 2010 opinion. In that opinion, Dr. Nelson opines that claimant is unable to work and that her combined impairments rendered her disabled as early as December of 2006. In support of this opinion, Dr. Nelson relied upon the entirety of claimant's medical records, including those of Dr. Bjorn, diagnostic tests, and his assessment of claimant as her treating pulmonologist. Once again, the ALJ gave no reasons for ignoring Dr. Nelson's September 28, 2010 opinion that claimant suffered from disabling impairments in December of 2006. I am therefore unable to determine whether the

ALJ even considered the opinion, much less properly weighed it.  Failure to consider these opinions from claimant's treating physicians constitutes reversible error.

The ALJ also substantially erred when he concluded that "the medical records do not document that any treating physician has ever found or imposed any significant physical or mental limitations on the claimant's functional capacity of twelve months in duration, despite strict compliance with her prescribed treatment." As shown above, both treating physicians rendered opinions that claimant suffered from disabling impairments and was unable to work as early as December of 2006. In the Pulmonary Impairment Questionnaire completed by Dr. Nelson, he opined that claimant, in an 8-hour day, could sit for only 2 hours a day and stand and/or walk less than 1 hour, would need unscheduled breaks, could never lift or carry more than 5 pounds and only occasionally lift 5 pounds, would need daily unscheduled breaks of 1-2 hours to rest during the workday, needed to avoid wetness, odors, fumes, temperature extremes, humidity, dust, perfumes, gases, solvents, cigarette smoke, soldering fluxes, and chemicals, would have constant interference with her attention and concentration, and would likely miss work more than 3 times per month due to her impairments.  Dr. Nelson concluded his opinion by stating, "I doubt she can work at all."  On cross-examination, the VE agreed that a hypothetical individual with these limitations would be precluded from

working.  The ALJ discounted Dr. Nelson's RFC as inconsistent "with the remainder of the record, including objective medical findings and diagnostic test results."  This finding is contrary to the substantial weight of the evidence, as Dr. Nelson's RFC is consistent with his own opinions, Dr. Bjorn's opinions, the medical records, and claimant's testimony.  Moreover, Dr. Nelson supported his opinion with specific diagnostic test results, including pulmonary functioning tests which demonstrated, among other things, that claimant's FEV1 was 29 percent.  Dr. Nelson also relied upon positive clinical findings of shortness of breath, chest tightness, wheezing, rhonchi, edema, episodic acute bronchitis, fatigue, and coughing.  This is not a case where claimant's treating physicians contradicted each other or a consultative medical examiner.  Here, the ALJ ignored the evidence of claimant's impairments provided by her treating physicians and instead impermissibly substituted his own opinion for that of claimant's physicians.  *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990).  In doing so, he clearly erred.

Claimant also contends that the ALJ improperly concluded that her testimony was not credible.  When determining the credibility of a claimant's subjective complaints, the ALJ must consider all evidence relating to the complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects

of medication; and any functional restrictions. *Halverson v. Astrue,* 600 F.3d 922, 931 (8th Cir. 2010); *Polaski,* 739 F.2d at 1322. While an ALJ need not explicitly discuss each *Polaski* factor in his decision, he nevertheless must acknowledge and consider these factors before discounting a claimant's subjective complaints. *Wildman v. Astrue,* 596 F.3d 959, 968 (8th Cir. 2010).

"[T]he duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints . . . under the Polaski standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." *Masterson v. Barnhart,* 363 F.3d 731, 738–39 (8th Cir. 2004). It is not enough that the record merely contain inconsistencies. Instead, the ALJ must specifically demonstrate in his decision that he considered all of the evidence. *Id.* at 738; *see also Cline v. Sullivan,* 939 F.2d 560, 565 (8th Cir. 1991). Where an ALJ explicitly considers the *Polaski* factors but then discredits a claimant's complaints for good reason, the decision should be upheld. *Hogan v. Apfel,* 239 F.3d 958, 962 (8th Cir. 2001).

Here, it appears that the ALJ's erroneous assessment of the treating physicians' opinions may have resulted in an improper credibility assessment under *Polaski*. The ALJ found that the claimant was not fully credible about the severity of her symptoms based on a lack of objective medical evidence in the record, as well as the claimant's limited treatment

record.  Yet, for the reasons discussed above, there was medical evidence in

the record demonstrating that claimant received treatment during the

relevant time period for severe and disabling COPD which the ALJ did not

consider.  Moreover, the ALJ concluded that "the record does not document

ongoing observations of significant breathing difficulties, or symptoms of

prolonged breathing difficulties . . . ."  This finding is contrary to the

substantial weight of the evidence, which demonstrates that claimant was

experiencing shortness of breath and difficulty breathing as early as

December of 2006.  Claimant was subsequently treated by Dr. Bjorn

regularly for shortness of breath thereafter.[5]   She was also hospitalized eight

times for shortness of breath and other complications arising from her COPD.

Claimant saw Dr. Nelson, a treating pulmonologist, regularly beginning in

August of 2009 for her COPD.  Dr. Nelson noted that claimant experienced

shortness of breath, cyclical respiratory infections, diminished breath sounds,

wheezing, and decreased air entry.  Dr. Nelson further opined that claimant

presented with clinical findings of chest tightness, rhonchi, edema, episodic

acute bronchitis, fatigue, and coughing.  According to Dr. Nelson's expert

opinion as a pulmonologist, these additional clinical findings supported his

---

[5] Claimant made complaints of shortness of breath to Dr. Bjorn on the following occasions: on January 26, 2007, September 14, 2007, December 15, 2008, March 27, 2009, July 31, 2009, January 18, 2010, June 25, 2010, July 16, 2010, and July 22, 2010.

diagnosis of COPD and chronic impairment of gas exchange due to clinically documented pulmonary disease. Instead of relying on Dr. Nelson's opinion, the ALJ substituted his own opinion about what symptoms he believed claimant should have exhibited if her breathing difficulties were severe. In so doing, the ALJ substantially erred. *See Ness*, 904 F.2d at 435.

The ALJ also discounted claimant's good earnings record because he felt it "paled" when considered in light of the "many factors that detract from her credibility." These factors included the medical evidence of record and the claimant's testimony regarding her daily activities. The ALJ pointed to claimant's testimony that she could pick up her cat, lift a gallon of milk, and perform basic household and personal care chores as evidence that her impairments were not disabling. Yet claimant's testimony regarding the limitations on her daily activities was supported by the medical evidence of record. Moreover, "the claimant's ability to perform activities such as fixing meals, watching movies, checking the mail, and doing laundry to any degree is inconsistent with her allegations of constant, debilitating symptoms." *Leckenby v. Astrue*, 487 F.3d 626, 634 (8th Cir. 2007) (internal quotation marks and citation omitted). Claimant testified that, although she could still perform some household chores, it took her much longer and required

frequent rest breaks.   She also required assistance cleaning house and doing the laundry, and had to shower sitting down.  She sometimes needed help dressing or caring for her hair.  Even on her good days, she cooked only simple, frozen meals.  Otherwise, she made cereal or sandwiches. Claimant's description of her daily activities does not provide substantial evidence to support the ALJ's credibility determination.  Where alleged inconsistencies upon which an ALJ relies to discredit a claimant's subjective complaints are not supported by – and indeed are contrary to – the record, the ALJ's ultimate conclusion that the claimant's symptoms are less severe than she claims is undermined.  *Baumgarten v. Chater*, 75 F.3d 366, 368-69 (8th Cir. 1996).  Here, the ALJ's credibility determination is not supported by substantial evidence as a whole.  In light of the above, it cannot be said that the ALJ demonstrated in his written decision that he considered all of the evidence relevant to claimant's complaints or that the evidence he considered so contradicted claimant's subjective complaints that her testimony could be discounted as not credible.  *See Masterson v. Barnhart*, 363 F.3d 731, 738-39 (8th Cir. 2004).  On remand, the ALJ should make a credibility determination based on a full and fair record.

Where, as here, an ALJ errs in his determination to discredit a claimant's subjective complaints and in his review of the medical evidence,

the resulting RFC assessment is called into question inasmuch as it does not include all the claimant's limitations. *See Holmstrom v. Massanari*, 270 F.3d 715, 722 (8th Cir. 2001). RFC is defined as "what [the claimant] can still do" despite her "physical or mental limitations." 20 C.F.R. § 404.1545(a). "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of claimant's mental and physical impairments." *Lauer v. Apfel*, 245 F.3d 700, 703 (8th Cir. 2000) (citing *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)). The Eighth Circuit has noted the ALJ must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations. *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000) (citing *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)). Upon remand, the Commissioner will be given the opportunity to review all the evidence under the appropriate standards when making his RFC determination.

I find that the ALJ did not fulfill his duty of fully and fairly developing the record and properly evaluating the evidence presented. As a result, I cannot conclude that there is substantial evidence on the record as a whole to support the ALJ's decision.

**Conclusion**

Because substantial evidence in the record as a whole does not support the ALJ's decision, this matter is remanded to the Commissioner for a consideration of claimant's claim in light of all medical records on file, including an evaluation of the opinions of claimant's treating physicians under the appropriate standards, and development of any additional facts as needed. The Commissioner should reevaluate claimant's impairments and complaints in accordance with *Polaski* and order additional consultative examinations,[6] if necessary, assess a residual functional capacity consistent with the medical and other evidence, and obtain vocational expert testimony to determine whether claimant was capable of performing work in the national economy with her limitations. Therefore, I reverse and remand under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Order.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is reversed and the case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order.

---

[6] The Court recognizes that a consultative examination of claimant will not be possible as she is deceased. However, the Commissioner may order a consultative examination of claimant's medical records if necessary.

A separate Judgment in accord with this Memorandum and Order is entered this same date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Date this 24th day of September, 2013.